# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| Elliott Company | ) | CASE NO. 1:05 CV 1387 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| Vs. | ) | |
| | ) | |
| Liberty Mutual Insurance | ) | JUDGE PATRICIA A. GAUGHAN |
| Company | ) | |
| | ) | |
| Defendant/Third | ) | |
| Party Plaintiff, | ) | |
| | ) | |
| Vs. | ) | |
| | ) | |
| United Technologies Corporation, *et al.* | ) | |
| | ) | **Memorandum of Opinion and Order** |
| Third Party Defendants. | ) | |

## INTRODUCTION

Plaintiff Elliott Company ("Elliott") and Defendant/Third Party Plaintiff Liberty Mutual Insurance Company ("Liberty") have filed cross-motions for partial summary judgment.[1]  (Doc. 37; Doc. 38).  This case arises out of Liberty's refusal to cover asbestos-related claims of Elliott.

---

[1]     Third Party Defendant United Technologies Corporation filed a response the to the cross-motions for summary judgment.  (Doc. 42).

1

For the following reasons, the parties' cross-motions are GRANTED IN PART AND DENIED IN PART.

### FACTS

At issue is insurance coverage for Elliott's asbestos-related claims for two periods—1957-1963 and 1980-1986.  Although the fundamental character of its operations has remained the same, Elliott's ownership and corporate structure changed a number of times during the relevant period.  On July 31, 1957, the Elliott Company, a Pennsylvania corporation, merged with the Carrier Corporation ("Carrier").  As part of the merger, the Elliott Company was dissolved and operated as a division of Carrier (the "Elliott Division").  Liberty insured Carrier from the time of the merger through January 1, 1963.  Carrier was a named insured on the policies during the relevant period (the "Carrier Policies"), as was "The Elliott Company, A Division of Carrier Corporation."  The Carrier Policies included broad occurrence-based general liability coverage for bodily and personal injuries related to an insured's products.

Carrier was purchased by third-party defendant United Technologies Corporation ("UTC") in 1979.  The Elliott Division continued as an unincorporated division of Carrier until August 21, 1981, when it was incorporated as Elliott Turbomachinery, Inc. ("Elliott Turbo").  Carrier, UTC and Elliott Turbo entered into "an Agreement and Plan of Reorganization and Corporate Separation" dated December 21, 1981 (the "Separation Agreement").  Elliott Turbo was assigned the liabilities of the Elliott Division.  The Separation Agreement included the following provision relevant to the transfer of rights under the Carrier Policies to Elliott Turbo:

> Carrier will . . . assign, transfer and deliver to [Elliott Turbo] all the properties, assets, good will of every kind and description, both real and personal, tangible and intangible of said [Elliott Division], as set forth in Exhibit A hereto.

2

Despite a diligent search, Elliott has not been able to locate Exhibit A to determine if it includes the Carrier Policies.  Nonetheless, it has provided the following evidence that the right to bring claims related to Elliott Division occurrences under the Carrier Policies transferred to Elliott Turbo:

- Prior to the Separation Agreement, Carrier's Board of Directors adopted a resolution that "the officers be and hereby are authorized and directed to distribute and transfer all of the business and assets . . . [of the Elliott Division] . . . subject to the [Elliott Division's] liabilities, to Elliott Turbomachinery Co., Inc., a wholly owned subsidiary of this Corporation . . . ."

- A 1997 letter from UTC's Office of the General Counsel to Elliott states as follows: "In 1981, [UTC] created a new subsidiary, [Elliott Turbo], and all of the assets and liabilities of the [Elliott Division] were transferred to this new subsidiary."

- Five 1997 letters from UTC's Office of the General Counsel to Elliott explaining that Elliott should defend lawsuits filed against the Elliott Division of Carrier.

Liberty counters this evidence with a number of contract provisions.  First, the Separation Agreement includes an integration clause,[2] which Liberty argues limits Elliott's ability to prove the terms of the Separation Agreement through secondary evidence such as the Board resolution. Second, some of the Carrier Policies include the following provision: "Assignment of any interest under this policy shall not bind [Liberty] until its consent is endorsed hereon . . . ." Liberty did not consent to an assignment of any interest under the Carrier Policies to Elliott Turbo.

The second set of policies at issue cover 1980 through 1986, when Elliott Turbo was covered by policies issued to UTC (the "UTC Policies").  Similar to the Carrier Policies, the

---

[2]     "This Agreement constitutes the entire agreement and understanding between the parties and supersedes all prior agreements and understandings related hereto."

UTC Policies provided occurrence-based coverage for bodily and personal injury claims related to an insured's products.

In 1987, UTC sold Elliott Turbo to a group of outside investors.  The Stock and Asset Purchase Agreement (the "Purchase Agreement") assigned Elliott Turbo's liabilities to the successor entity (Elliott, the plaintiff in this lawsuit) and addressed insurance as follows:

> 2.12.  _Insurance_.  Schedule 2.12 (i) sets forth all of the policies of insurance of or under which any Member of the Group[3] is the owner, insured or beneficiary, or covering any of the property of any Member of the Group . . . . [T]he interest of each Member of the Group as a named insured under or beneficiary of any of such policies shall terminate on the Closing Date except insofar as coverage relates to events, occurrences or losses sustained prior to the Closing Date which are covered by such policies.

Liberty admits that the UTC Policies were included on Schedule 2.12 (i), but notes that none of the Carrier policies were included.  Liberty also explains that UTC and Elliott did not obtain its consent to the transfer of any interest in the UTC Policies despite the following: "No assignment of interest under this policy shall bind [Liberty] until its consent is endorsed hereon."

By 1994, UTC and Carrier had incurred losses of more than $150 million and Liberty was disputing coverage.  The "UTC Companies"[4] and Liberty settled this dispute on December 9, 1994 (the "Settlement Agreement").  Liberty agreed to pay $24.9 million over approximately seven years and forgive $11 million in premiums allegedly due to Liberty.  In return, the UTC

---

[3]  "Member of the Group" is defined as Elliott Turbo and certain foreign subsidiaries.

[4]  The "UTC Companies" included UTC, Carrier, Mostek, Hamilton Standard Controls, Inc., Homogenous Metals, Inc., Otis Elevator Company, United Technologies Automotive, Inc., and "their respective successors, subsidiaries, affiliates and divisions . . . ."

4

Companies agreed to the following release of Liberty:[5]

> from any and all claims . . . which they now have, ever had or may have in the future,[6] with respect to the [insurance policies, including the Carrier and UTC Policies[7]] arising out of, and on account of any past, present or future Environmental Claims,[8] all claims asserted or which could have been asserted by the UTC Companies against Liberty in the [underlying lawsuits], as well as any other policies that Liberty may have issued to UTC or its predecessors, successors, subsidiaries, parents, affiliates and divisions, arising out of any past, present or future Environmental Claims, including any claims, or rights that the UTC Companies may possess or retain as a result of their former ownership of entities that are no longer owned by the UTC Companies.

The Settlement Agreement also included an indemnity provision related to claims by

former subsidiaries of UTC:

---

[5]    Another provision of the settlement agreement states as follows:

> The Parties intend and affirm that this Agreement shall operate as a complete and absolute termination of any and all of the Parties' rights and obligations, of any nature whatsoever, whether known or unknown, arising from or in any way related to the Subject Insurance Policies with respect to Environmental Claims except as otherwise expressly set forth in this Agreement, and all the terms and conditions of this Agreement shall be construed by the Parties in a manner consistent therewith.

[6]    Elliott focuses on this release of future UTC claims in arguing that the UTC policies were not in fact exhausted.  In this regard, Elliott also points to the following settlement agreement language: "Whereas, the UTC Companies have incurred and may incur in the future certain liabilities, expenses and losses arising out of Environmental Claims."

[7]    Unlike the Purchase Agreement, which only lists the UTC Policies in the attached schedule, both the Carrier Policies and UTC Policies are included in a schedule of policies covered by the Settlement Agreement.

[8]    The term "Environmental Claims" is broadly defined to include claims such as the asbestos-related claims at issue here.

5

> Defense and Indemnification Regarding Actions Filed by Former UTC
> Subsidiaries. [T]he UTC Companies shall defend and indemnify Liberty with
> respect to any Action against Liberty by former subsidiaries of the UTC
> Companies alleging that Liberty should provide coverage that, absent this
> Agreement, may be owed to them solely under one or more of the Subject
> Insurance Policies for Environmental Claims.

Each of the UTC Policies included yearly general liability limits.  As of the time of the

Settlement Agreement, both the 1980-1981 and 1983-1984 limits were exhausted.  The

Settlement Agreement allocated the settlement value in a manner that exhausted all of the

remaining UTC Policies[9] with the exception of the 1985-1986 products liability aggregate limit,

which remained at over $14 million after the settlement.

Although Elliott was a separate entity at the time of the Settlement Agreement, Liberty

notes that both the Carrier and UTC Policies included "Agency Authorization" provisions such

as the following:

> Carrier Corporation[10] is authorized, and by acceptance of the policy agrees, to act
> on behalf of all insured with respect to all matters relating to the insurance
> afforded by the policy, including the giving and receiving of notice of
> cancellation, the payment of premiums and the receiving of return premiums, if
> any, and such dividends as may be declared by the company.

Elliott responds that UTC did not believe that it was releasing the claims of former

subsidiaries such as Elliott under the Settlement Agreement.  Indeed, UTC has taken that

position in this litigation.  Also, in a 1997 letter, UTC's Assistant General Counsel advised

---

[9]     Specifically, the settlement agreement attributed the settlement
value to the general liability limits for the relevant years as
follows: 1981-1982–$666,667; 1982-1983–$1,510612; 1984-
1985–$14,304,942; 1985-1986 (non products liability) –
$4,380,827.

[10]    The Agency Authorization provision of the UTC Policy is not
materially different from the provision quoted above.

6

Elliott that the settlement agreement "does not apply to coverage claims by a former UTC subsidiary on account of environmental claims asserted against the former subsidiary."

There is also some evidence that Liberty was aware that the Settlement Agreement did not cover claims by Elliott.  First, Liberty was on notice that Elliott was making claims under the Policies before the Settlement Agreement.  It nonetheless did not explicitly include such claims in the settlement.  Second, in 1995 Liberty notified UTC that it was retaining over 2500 asbestos claims against Elliott.  Third, Liberty acknowledged in correspondence with UTC that some asbestos claims were not covered by the settlement.

At issue here is coverage for thousands of asbestos-related lawsuits filed against Elliott. For its part, Carrier has disclaimed any liability related to the Elliott Division or Elliott Turbo on the basis that the respective Elliott entities have retained all of their assets and liabilities despite their corporate identities within Carrier.  Elliott has assumed the defense of all claims related to the Elliott Division and Elliott Turbo.

**STANDARD OF REVIEW**

In accordance with Federal Rule of Civil Procedure 56, summary judgment is appropriate when no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *LaPointe v. UAW Local 600*, 8 F.3d 376, 378 (6th Cir. 1993).  The burden of showing the absence of any such genuine issues of material facts rests with the moving party:

> [A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrates the absence of a genuine issue of material fact.

*Celotex*, 477 U.S. at 323.  A fact is material only if its resolution might affect the outcome of the lawsuit under the governing law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Once the moving party has satisfied its burden of proof, the burden then shifts to the nonmoving party pursuant to Federal Rule of Civil Procedure 56(e), which provides:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.  If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

In ruling upon the motion, the court must afford all reasonable inferences and construe the evidence in the light most favorable to the nonmoving party.  *Cox v. Kentucky Dept. of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995); *United States v. Hodges X-Ray, Inc.*, 759 F.2d 557, 562 (6th Cir. 1985).  However, "[t]he nonmoving party must come forward with some significant probative evidence to support its claim.  If the nonmoving party fails to make a sufficient showing on an essential element, which it has the burden of proof, the moving party is entitled to summary judgment." *Brumbalough v. Camelot Care Centers, Inc.*, 427 F.3d 996, 1001 (6th Cir. 2005) (citing *Celotex*, 477 U.S. at 323-24).

## **DISCUSSION**

The parties' cross-motions for partial summary judgment address Elliott's rights to coverage under the Carrier and UTC Policies in light of the terms of the Separation Agreement, Purchase Agreement and Settlement Agreement.  Liberty makes a number of arguments that Elliott is not entitled to such coverage.  First, Liberty argues that Carrier and UTC did not transfer to Elliott the right to bring claims under the Policies.  Second, Liberty argues that the

8

Settlement Agreement released Liberty from any claims Elliott might have had under the Policies.  Third, Liberty argues that even absent a release the Settlement Agreement exhausted the policy limits of many of the relevant Policies.  Elliott disagrees with all three propositions and seeks partial summary judgment that Liberty must indemnify and defend claims against Elliott.

Choice of Law

The Court must apply the choice of law rules for the state in which it sits.  *Miller v. State Farm Mut. Auto. Ins. Co.*, 87 F.3d 822, 824 (6th Cir. 1996).   Liberty notes that the Separation Agreement provides that it will be governed by Delaware law.  However, Liberty does not explain how the parties' choice of Delaware law in the Separation Agreement relates to the many legal issues outside of that Agreement.  Elliott counters that under Ohio's choice of law rules New York, Ohio, Pennsylvania or Connecticut law might apply.  Neither party has provided any further facts from which the Court could ascertain which state's law applies.  Because both Liberty and Elliott contend that the same result would be reached in all of the relevant states, and because the Court finds no conflicting state supreme court precedent, the Court will consider the law of Delaware, New York, Ohio, Pennsylvania and Connecticut.

Transfer of Coverage Rights to Elliott

The underlying asbestos-related claims asserted against Elliott relate to events that occurred at the Elliott Division and Elliott Turbo prior to Elliott's corporate existence.  The Carrier and UTC Policies were in force at the time of these occurrences, but Elliott of course was not a named insured under those policies.  Elliott argues that it is entitled to coverage for its liability related to those occurrences, both because the coverage rights were assigned to Elliott

9

through the Separation and Purchase Agreements and because it is entitled to coverage by

operation of law.  Liberty disputes both of these assertions and also argues that the no-

assignment clause in the Policies prohibits any transfer of rights under the Policies to Elliott.

*The No-assignment Clause*

The Court will first address the no-assignment clause.  The vast majority of courts,

including courts in Ohio, Pennsylvania, Connecticut, New York and Delaware, hold that no-

assignment clauses do not prevent the voluntary assignment of coverage rights under occurrence-

based policies for claims related to preassignment occurrences.  Some courts reach this result by

reference to the no-assignment language.  These clauses, like the one at issue here, only prevent

the assignment of the "policy" as opposed to claims.  Thus, a number of courts find that the

assignment of the right to bring claims is not contrary to the no-assignment clause as a matter of

contract.  *Viola v. Fireman's Fund Ins. Co.*, 965 F. Supp. 654, 659 (E.D. Pa. 1997); *Fiorentino v.*

*Lightning Rod. Mut. Ins. Co.*, 692 N.E.2d 1099, 1101-03 (Ohio App. 9th Dist. 1996).

Other courts focus on the practical import of these clauses.  These courts reason that the

insurer is not harmed by the assignment of rights to claims for preassignment occurrences since

the assigned risk is the same risk it initially agreed to insure.  *Peck v. Public Serv. Mut. Ins. Co.*,

114 F. Supp. 2d 51, 56 (D. Conn. 2000); *Viola*, 965 F. Supp. at 659; *Int'l Rediscount Corp. v.*

*Hartford Accident & Indem. Co.*, 425 F. Supp. 669, 672-73 (D. Del. 1977); *Conrad Bros. v. John*

*Deere Ins. Co.*, 640 N.W.2d 231, 237 (Iowa 2001) (citing cases); *Ins. Co. of N. Am. v. Snyder*

*Moving & Storage, Inc.,* No. 01-15975, 52 Fed. Appx. 899, 903-04 (9th Cir. Dec. 6, 2002);

*Texaco A/S S.A. v. Commercial Ins. Co. of Newark* , 90 Civ. 2722 (JFK), 1995 U.S. Dist. LEXIS

15818, *17-18 (S.D.N.Y. Oct. 26, 1995).

Liberty cites *Henkel Corp. v. Hartford Accident & Indem. Co.* for the proposition that the no-assignment provision should be enforced with respect to Elliott's preassignment claims. 63 P.3d 69, 75 (Cal. 2003). *Henkel* acknowledged that "a provision in a contract or a rule of law against assignment does not preclude the assignment of money due or to become due under the contract or of money damages for the breach of the contract." *Id*. at 75; *see also Century Indem. Co. v. Aero-Motive Co.*, 318 F. Supp. 2d 530, 539 (W.D. Mich. 2003). However, *Henkel* held that only claims that have been reduced to money damages before assignment may be transferred without regard to a no-assignment clause. *Henkel*, 63 P.3d at 75-76; *see also Century*, 318 F. Supp. 2d at 540 (adopting the reasoning and result of *Henkel*). *Henkel* also found that insurers are harmed by the assignment of claims not reduced to money damages since the insurer might have to defend more than one entity. *Henkel*, 63 P.3d at 75 (explaining that in light of the "ubiquitous potential for disputes over the existence and scope of the assignment . . . , the insurer might effectively be forced to undertake the burden of defending both parties").

Nonetheless, courts in Ohio, Pennsylvania, Connecticut, New York and Delaware (all of the jurisdictions whose law might apply to aspects of this case) have held otherwise. *Fiorentino*, 692 N.E.2d at 1103 (Ohio); *Peck*, 114 F. Supp. 2d at 56 (Connecticut); *Viola*, 965 F. Supp. at 659 (Pennsylvania); *Int'l Rediscount*, 425 F. Supp. at 672-73 (Delaware); *Texaco*, 1995 U.S. Dist. LEXIS 15818, *17-18 (New York). Because *Henkel* and *Century* conflict with this precedent, they should not be followed. Accordingly, the Court finds that the no-assignment clauses do not preclude the assignment of coverage for preassignment occurrences.

### Assignment of Coverage by Contract

Elliott argues that rights under the Carrier and UTC Policies were assigned by contract.

11

Regarding the UTC Policies, Liberty admits that the Purchase Agreement purported to assign to Elliott coverage for "events, occurrences or losses sustained prior to the Closing Date which are covered by such policies."  Liberty's only argument that such coverage was not assigned is the no-assignment clause of the UTC Policies.  In light of the Court's conclusion that a no-assignment clause does not prevent the voluntary assignment of coverage for events, occurrences or losses that occur prior to the assignment, the Court finds that coverage for such occurrences under the UTC policies was properly assigned to Elliott.

The Carrier Policies are more problematic.  Schedule A of the Separation Agreement—which sets out in detail the assets assigned to Elliott Turbo when it separated from Carrier—has been lost.  Thus, it is unclear from the Separation Agreement whether the Carrier Policies were assigned to Elliott Turbo.  Liberty contends that this omission is fatal to Elliott's attempts to claim coverage under the Carrier Policies.  Elliott responds with secondary evidence that it believes demonstrates that the coverage was transferred.  Liberty argues that this secondary evidence cannot be considered, particularly in light of the integration clause of the Separation Agreement.

Any dispute over the missing contents of Exhibit A to the Separation Agreement is conclusively settled by the unambiguous language of the Purchase Agreement, which discussed insurance as follows:

> 2.12.   Insurance.   Schedule 2.12 (i) sets forth all of the policies of insurance of or under which any [Elliott entity][11] is the owner, insured or beneficiary, or covering any of the property of any [Elliott entity] . . . . [T]he interest of each [Elliott Entity] as a named insured under or beneficiary of any of such policies shall terminate on the Closing Date except insofar as coverage

---

[11]     This includes Elliott Turbo and its foreign subsidiaries.

relates to events, occurrences or losses sustained prior to the Closing Date which
are covered by such policies.

(Emphasis added).  Schedule 2.12(i) provides a comprehensive list of policies, but does not list the Carrier Policies.

Elliott contends that it was unnecessary to include the Carrier Policies, since they were already transferred to Elliott Turbo through the Separation Agreement.  However, the language of provision 2.12 is unambiguous.  Schedule 2.12(i), which does not include the Carrier Policies,[12] "sets forth *all* of the policies of insurance of or under which *any* [Elliott Entity, including Elliott Turbo] is the owner, insured or beneficiary, or covering *any* of the property of *any* [Elliott Entity including Elliott Turbo.]" (emphasis added).  Moreover, Elliott has not pointed to any other provision of the Purchase Agreement which might have transferred coverage rights under the Carrier Policies to Elliott.  Accordingly, the Purchase Agreement evidences an unambiguous intent not to assign those rights to Elliott.

In sum, rights under the UTC Policies were assigned to Elliott, but rights under the Carrier Policies were not.

*Coverage by Operation of Law*

Elliott next contends that even in the absence of a contractual assignment, coverage under the Policies transferred to it by operation of law.  Courts have transferred coverage by operation of law in a number of situations.  The most common situation occurs during a corporate merger. State corporation laws dictate that all of the assets and liabilities of a corporation transfer to the

---

[12]     Indeed, when UTC wished to include the Carrier Policies in a
schedule of policies a few years later in the Settlement Agreement,
it did so.

13

merged entity.  Accordingly, insurance coverage for premerger occurrences transfers to the

merged entity under those statutes.[13]  *E.g., Knoll Pharm. Co. v. Auto Ins. Co.*, 167 F. Supp. 2d

1004, 1010-11 (N.D. Ill. 2001); *Brunswick Corp. v. St. Paul Fire & Marine Ins. Co.*, 509 F.

Supp. 750, 752-53 (E.D. Pa. 1981); *Texaco*, 1995 U.S. Dist. LEXIS 15818, *17.

Here, the Elliott Division was a division of Carrier before it was incorporated as Elliott

Turbo and Elliott Turbo was a subsidiary of UTC when it was purchased and formed as the

independent company Elliott.  Elliott has not pointed to any corporate law that would apply to

these transactions in the same manner as the merger laws.  Instead, Elliott relies on a broader

operation of law theory that coverage follows liability even in the absence of a formal

assignment of coverage rights.

This broad operation of law theory is often attributed to the Ninth Circuit's decision in

*Northern Ins. Co. of New York v. Allied Mut. Ins. Co.*, 955 F.2d 1353 (9th Cir. 1992).[14]  *Northern*

*Insurance* involved a dispute between insurers (Northern and Allied) over defense costs for

claims brought against the Brown-Forman Corporation.  The plaintiff in the underlying action

claimed that her consumption California Cooler alcoholic beverages during pregnancy caused

her child's birth defects.  *Id*. at 1355.  Brown-Forman purchased California Cooler two years

---

[13]     These courts also hold that a no-assignment clause in the
         underlying policy does not prevent the transfer of coverage rights
         to the merged entity.  *Knoll*, 167 F. Supp. 2d at 1010 n.7;
         *Brunswick*, 509 F. Supp. at 753.

[14]     *See, e.g., The Glidden Company v. Lumbermens Mutual Casualty*,
         No. 81782, 2004 Ohio App. LEXIS 6468, *32-33 (Ohio App. 8th
         Dist. Dec. 17, 2004), *discretionary appeal allowed* 828 N.E.2d 115
         (Ohio 2005) ("We agree with the *Northern Insurance* line of cases
         and the rule that insurance benefits follow the liability for losses
         arising from pre-acquisition activities by operation of law.").

14

after the child's birth and two years before the lawsuit was filed.  *Id*.  It then sought indemnity and a defense from Allied, one of California Cooler's insurers.  *Id*. at 1356.

In *Northern Insurance*, the asset purchase agreement excluded from the sale any contracts that required consent to assign.  The insurance policies at issue in *Northern Insurance* had no-assignment clauses.  *Northern Ins.*, 955 F.2d at 1357.  Thus Allied contended, and the Ninth Circuit agreed, that rights under the Allied policy were excluded by the terms of the asset purchase agreement.  *Id*.  Nonetheless, the Ninth Circuit relied upon one of the earlier of no-assignment clause cases[15] and held that the policy rights at issue transferred by "operation of law" even though they did not transfer under the parties' contract.  *Northern Ins.*, 955 F.2d at 1358.  Like the courts that have refused to enforce no-assignment clauses to prevent actual assignment of coverage, the Ninth Circuit reasoned that the insurer was not harmed, since it contemplated the particular risk when it agreed to insure the seller.

The Ninth Circuit also based its conclusion in part on the product-line successor liability theory that the plaintiff asserted in the underlying action.  *Id*. at 1357.  Under this theory, a purchaser of substantially all of the assets of a firm also assumes that firm's liabilities from presale activities without regard to contrary clauses in the asset purchase agreement.  *Id.* at 1357.  This theory protects consumers who might otherwise be left without a viable entity to sue for damages if the selling entity ceases operations.  Having concluded that liability transferred to Brown-Forman by operation of law, the Ninth Circuit next decided that the right to indemnity and defense also transferred by operation of law.  *Id*. at 1358.

---

[15]     *Ocean Accident Guar. Corp. v. Southwestern Bell Tel. Co.*, 100 F.2d 441 (8th Cir. 1939).

Litigants, and some later courts, have read *Northern Insurance* to stand for the general proposition that insurance coverage always follows liability without regard to the intent of the parties to the corporate transaction.  However, the actual holding of *Northern Insurance* did not have so broad a sweep.

First, although couched in "operation of law" language, *Northern Insurance* really involved a somewhat awkward application of the traditional rule that no-assignment clauses do not bar the contractual assignment of coverage for presale occurrences.  *Cf., Gen. Accident Ins. Co. of Am. v. Western MacArthur Co.*, 55 Cal. App. 4th 1444, 1450-51 (1997) (noting that the *Northern Insurance* court relied solely upon no-assignment clause authority in reaching its decision).  In *Northern Insurance*, California Cooler and Brown-Forman did not explicitly exclude the policies at issue from the asset purchase agreement.  *Northern Ins.*, 955 F.2d at 1537. Rather, they were excluded by another provision in the purchase agreement that excluded all contracts requiring the consent of third parties.  *Id.*  In other words, the policies at issue would have been transferred by the corporate agreement but for the no-assignment clause in the insurance policy.  Thus, *Northern Insurance*, despite its "operation of law" language, avoided raising form over substance by giving effect to the traditional rule as applied to a peculiar contract provision.

Second, several courts that have rejected the broad application of *Northern Insurance* note that liability also passed to the purchaser by operation of law under a product-line successor liability theory.  *Red Arrow Prods. Co. v. Employers Ins. of Wausau*, 607 N.W.2d 294, 300 (Wisc. App. 2000); *Quemetco Inc. v. Pac. Auto. Ins. Co.*, 24 Cal. App. 4th 494, 501 (1994); *Koppers Indus., Inc. v. Beazer East, Inc.*, No. 94-1706, 1996 U.S. Dist. LEXIS 22860, *18 (W.D.

Penn. March 5, 1996).  According to these courts, *Northern Insurance* merely stands for the proposition that coverage can be imposed by operation of law when the underlying liability is also imposed by operation of law.

Nonetheless, a number of courts have relied on the merger cases and *Northern Insurance* for the broader proposition that coverage follows liability.[16]  In *B.S.B. Diversified Co., Inc. v. Am. Motorists Ins. Co.*, the court first found that coverage transferred to the successor entity by contract.  947 F. Supp. 1476, 1480 (W.D. Wash. 1996).  In the alternative, the court held that coverage passed to the successor entity by operation of law.  *Id*. at 1481.  The *B.S.B.* court reasoned that "insurers' risks have not increased when their duty to indemnify and defend relates to events occurring prior to transfer."  *Id*.  This was true even though the insurer might also have to defend the predecessor entity for the same environmental liabilities.  *Id*.

In *Total Waste Management Corp. v. Commercial Union Insurance Co.*, Total Waste Management ("TWM") brought a declaratory judgment action against a number of insurers seeking indemnification and payment of defense costs.  857 F. Supp. 140, 142 (D.N.H. 1994).  The plaintiff in the underlying action alleged that TWM was responsible for releases of oil and hazardous substances on its property, based in part on the actions of George West, a company from which TWM had purchased "certain assets of the waste oil and collection and sales

---

[16]     Plaintiff cites *Texaco A/S S.A. v. Commercial Ins. Co. of Newark* as a case involving the broad application of the operation of law principle.  90 Civ. 2722 (JFK), 1995 U.S. Dist. LEXIS 15818 (S.D.N.Y. Oct. 26, 1995).  However, the district court in *Texaco* treated the underlying corporate transaction as a merger, and thus followed the accepted rule that insurance rights pass in a merger. *Id*. at *16-17.  *Northern Insurance* was cited for the traditional rule that no-assignment clauses do not bar the transfer of coverage for preacquisition activities of the successor.  *Id*. at *17-18.

business" a number of years earlier.  *Id*. at 142-43.  One of the issues in the declaratory judgment action was whether insurance policies issued to George West could provide coverage to TWM should TWM be found liable for George West's actions.  *Id*. at 150.

The district court considered both the merger and *Northern Insurance* lines of cases. Although George West and TWM did not merge,[17] the court concluded that "[l]ike a corporation succeeding to the rights of the merged corporation, a potential successor corporation by definition should also be entitled to those same rights."  *Id*. at 151.  The court characterized *Northern Insurance* as a product-line successor liability case and, without much discussion, concluded that "the Ninth Circuit's reasoning is persuasive authority in deciding whether a potential corporate successor is entitled to coverage under its predecessor's insurance policy for a risk occurring before the transfer of assets."  *Id*. at 152.  Finally, the court held that a no-assignment clause does not apply to policy rights transferred by operation of law.  *Id*. at 152-53.

Neither *B.S.B Diversified* nor *Total Waste Management* conclusively decided the specific issue in this case—whether coverage can pass by operation of law where liability was assumed by contract.  *B.S.B. Diversified's* holding was dicta, since the court also found that coverage passed by contract.  947 F. Supp. at 1480.  In *Total Waste Management*, liability passed by operation of law.  *See* 857 F. Supp. at 150-51 (explaining that TWM might be a successor to George West's liabilities, even though the purchase agreement between the two only involved the purchase of assets and George West continued to operate).  The first court to unequivocally

_____

[17]     TWM only purchased "certain assets" of George West in Maine, New Hampshire and Vermont, and George West continued its operations after the asset sale.  *Total Waste Mgmt.*, 857 F. Supp. at 151.

18

do so was a divided Ohio Court of Appeals in *The Glidden Company v. Lumbermens Mutual Casualty*, No. 81782, 2004 Ohio App. LEXIS 6468 (Ohio App. 8th Dist. Dec. 17, 2004), *discretionary appeal allowed* 828 N.E.2d 115 (Ohio 2005).

The underlying claims in *Glidden* were products liability actions related to the manufacture and sale of lead paint prior to 1974.  *Id*. at *5.  The Glidden Company plaintiff sought a declaratory judgment that it was entitled to coverage under insurance policies written to predecessor entities.  *Id*.  The Glidden plaintiff came into existence via a complicated string of commercial transactions, but it was clear that an earlier predecessor entity "explicitly excluded all insurance policies from the distribution of the paints business to [a later predecessor entity] in the memorandum of distribution."[18]  *Id*. at *22.  The parties to the various transactions, including Glidden, had nonetheless agreed to share liabilities from the paints business.  *Id*. at 8-9.

Glidden's only argument for coverage was that those rights passed by operation of law.  *Id*. at 22.  The *Glidden* court thus defined the issue as whether coverage always follows liability.  *Id*. at *26.  The court first surveyed decisions applying an operation of law theory, including merger cases, *Northern Insurance, B.S.B. Diversified* and *Total Waste Management.  Id*. at 25-27.  The court next discussed a number of decisions that have either limited or rejected attempts of predecessor corporations to acquire coverage, including *Henkel Corp. v. Hartford Accident & Indem. Co.,* which this Court discussed above regarding no-assignment clauses.  The *Glidden* court concluded as follows:

We believe the better-reasoned authority applies the operation of law theory.

---

[18]     The court noted that most courts refuse to enforce no-assignment provisions.  *Id*. at *22 n.8.  However, in *Glidden* there was not an assignment in the first place.

19

> Courts applying this theory have continued to extend its application to more
> general successor liability situations.  We find that a corporation which succeeds
> to liability for pre-acquisition operations of another entity acquires rights of
> coverage by operation of law.  This theory applies even where the acquisition was
> a purchase of assets or only part of a predecessor corporation.

*Id*. at 30.  In other words, neither insurance companies (through restrictive no-assignment

clauses) nor the parties to a corporate transaction (through express agreement) can limit the

ability of a corporation that succeeds to liability to claim coverage under an insurance policy.

The *Glidden* court justified its holding as follows:

> When the activities giving rise to the damage or loss occur during the term of the
> policy and prior to any transfer of assets, the risk is no greater than when the
> policy was written. . . .To find that an insurance company is not obligated to
> provide coverage to a party that is liable for a risk the insurance company
> promised to insure against and for which they were paid an agreed premium
> would result in an unfair windfall to the insurance company.

*Id*. at 31.

The *Glidden* dissent disagreed that the insurer would receive a windfall.  It quoted the

lower court as follows: "The logical extension of [the majority's] theory, if accepted, would

require the defendant insurers to defend the ten or more 'fan companies' to which Hanson

spun-off [a predecessor company's] operating divisional assets."  *Id*. at *40. The *Glidden* dissent

believed that "[w]hether one is entitled to the benefits of coverage under a policy of insurance is

a matter of contract, not tort, law."  *Id*. at *41.

The Court agrees with the *Glidden* dissent.  When a successor entity acquires liability by

contract, it is not entitled to coverage for that liability unless coverage was also acquired by

contract.[19]  The rule proposed by Elliott and adopted by the *Glidden* majority is a vast expansion

---

[19]     The Court recognizes that this holding is arguably inconsistent
with the Court's earlier conclusion that a no-assignment clause

20

even of prior cases such as *Northern Insurance*. *Glidden* is an unpublished decision with a

strong dissent, and the Ohio Supreme Court has granted discretionary review. This Court

believes that the Ohio Supreme Court[20] and the highest courts in the other relevant jurisdictions

will agree with what most other courts to address the issue have recognized[21]—namely, that the

---

does not prohibit assignment of claims between parties to an asset purchase agreement. Many of the same arguments apply to both situations. *See, e.g., Century*, 318 F. Supp. 2d at 535-41. However, the rule that a no-assignment clause in an insurance contract does not prohibit assignment of claims between parties to an asset purchase agreement has a long history in courts throughout the country and has been accepted by courts in the relevant jurisdictions. Other than the *Glidden* majority, no other court in these jurisdictions has held that insurance coverage transfers by operation law even when the parties to the asset purchase agreement *chose not to assign coverage*. As the Court will describe below, even accepting the general no-assignment rule adopted in the relevant jurisdictions, there are further reasons not to create what is essentially a new coverage-follows-liability tort duty.

[20] The Court's goal is to determine how the Ohio Supreme Court would decide the issue. *Managed Healthcare Assocs., Inc. v. Kethan*, 209 F.3d 923, 927 (6th Cir. 2000). *Glidden*, a 2-1 decision, is now on appeal to that court. Although the Court may look to decisions of an intermediate court of appeals in determining how the Ohio Supreme Court may rule on an issue, it must not adopt the appellate court's reasoning if it is convinced that the Ohio Supreme Court would reach a different result. *Taylor Steel, Inc. v. Keeton*, 417 F.3d 598, 608 (6th Cir. 2005). In declining to follow the *Glidden* majority, the Court keeps in mind that "when given a choice between an interpretation of [state] law which reasonably restricts liability, and one which greatly expands liability, we should choose the narrower and more reasonable path." *Combs v. Int'l Ins. Co.*, 354 F.3d 568, 577 (6th Cir. 2004). This Court is thus "extremely cautious about adopting [the] 'substantive innovation'" proposed by Elliott. *Id.* at 578.

[21] When the state supreme court has not spoken on an issue, the court is to consider all relevant data, including decisions from other jurisdictions. *Combs*, 354 F.3d at 577.

21

*Northern Insurance* line of cases is too weak a foundation upon which to build a far-reaching blanket rule that coverage always follows liability, even when the parties to the corporate agreement chose not to assign coverage.  *E.g.,Century,* 318 F. Supp. 2d at 539; *Snyder Moving*, 52 Fed. Appx. at 904; *Henkel,* 63 P.3d at 74;  *Gen. Accident*, 55 Cal. App. 4th at 1450-51; *Quemetco*, 24 Cal. App. 4th at 501; *Red Arrow*, 607 N.W.2d at 302; *Glidden*, 2004 Ohio App. LEXIS 6468, *42 (dissenting); *Koppers*, 1996 U.S. Dist. LEXIS 22860, *11 n.3.

The California courts have since rejected *Northern Insurance's* prediction of California law.  *Henkel,* 63 P.3d at 74; *Gen. Accident*, 55 Cal. App. 4th at 1450-51; *Quemetco*, 24 Cal. App. 4th at 501.  *Northern Insurance* was based on peculiar facts.  The underlying liability also passed by operation of law under a product-line successor liability theory.  *Quemetco*, 24 Cal. App. 4th at 501; *Koppers,* 1996 U.S. Dist. LEXIS 22860, *18.  Morever, the *Northern Insurance* court treated the transfer by operation of law issue in the same manner as the no-assignment clause issue.  *Gen. Accident*, 55 Cal. App. 4th at 1450-51.  As the Court previously explained, this treatment has a simple explanation.  In *Northern Insurance*, the only reason that coverage was not assigned by contract was the no-assignment clause.  *Northern Ins.*, 955 F.2d at 1537.

However, the reasoning for allowing assignments in spite of no-assignment provisions does not necessarily apply when the parties to the corporate transaction knowingly choose not to assign insurance coverage for transferred liabilities.  First, in refusing to enforce no-assignment clauses, a number of courts rely upon language which only prohibits the transfer of policies, not claims.  In other words, these decisions are based on contract principles rather than an extra-contractual doctrine that coverage always follows liability.  Second, the insurer is unlikely to receive a windfall in many cases where the parties to the corporate transaction choose not to

22

assign coverage to the successor entity.  Insurance policies often have coverage limits.  A predecessor entity is most likely not to assign coverage rights to a successor entity if it is concerned that the policy limit will be exceeded.  To the extent that those limits have been reached, as Liberty and UTC contend most have here, the insurer has already paid all that it agreed to pay.  *Koppers*, 1996 U.S. Dist. LEXIS 22860, *11 n.3.  Third, an insurer is more likely to face increased risk from defending multiple parties when coverage is transferred by operation of law.  The predecessor entity, which thought it would be the sole entity covered by the policy, will surely seek a defense from the insured if it is sued on claims covered by that policy.  However, when coverage for particular claims is transferred by contract, the predecessor entity should understand that only the successor entity is entitled to a defense.  Finally, the uncertainty created by an amorphous and far-reaching operation of law theory encourages disputes and litigation over coverage, which also adds to an insurer's costs.

The operation of law theory proposed by Elliott also burdens other parties covered by the policies.  There is no reason to deprive the seller of assets of the benefit of its bargain.  Sophisticated corporate entities presumably negotiate the transfer of liabilities.  In some instances, the purchaser might pay for the right to bring claims under insurance policies that cover those liabilities.  If the seller does not retain liabilities that are covered by the policies, there is little potential for conflict.  However, if the seller contemplates that it may also seek coverage under the policies in the future (as UTC and Carrier did here), there is a strong potential for conflict over policy limits.  The seller may prefer not to transfer any or all of its policy rights, or may only do so at a premium price.  In any event, this decision is for sophisticated entities with freedom of contract to make without interference from the courts.

23

As one state supreme court stated, "when liability is assumed by contract, the successor's rights are defined and limited by that contract." *Henkel,* 63 P.3d at 74.  If sophisticated parties to a corporate transaction do not intend for the entity acquiring liability to also succeed to coverage, there is no reason for the courts to rewrite their contracts.  *See Century,* 318 F. Supp. 2d at 539 (holding that "the relationship between an insurer and an insured is determined under contract principles rather than upon public policy"); *Snyder Moving*, 52 Fed. Appx. at 904 ("[T]he purchaser generally is not entitled to an interest in an insurance policy issued to the seller unless the purchase agreement expressly provides for the transfer of specific benefits."); *Glidden*, 2004 Ohio App. LEXIS 6468, *42 (dissenting) ("Whether one is entitled to the benefits of coverage under a policy of insurance is a matter of contract, not tort, law.").  "[T]he Court cannot penalize [the insurer] because it is the apparent intent of both" the buyer and seller to exclude insurance rights from the purchase agreement.  *Koppers*, 1996 U.S. Dist. LEXIS 22860, *11 n.3.

The UTC/Liberty Settlement And Exhaustion of Policy Limits

Having concluded that Elliott is entitled to bring claims under the UTC Policies, the Court must next turn to the issues of settlement and exhaustion.  Liberty makes three main arguments that the Settlement Agreement bars some or all of Elliott's claims.  First, Liberty points to the agency provisions of the UTC Policies and argues that UTC was empowered to and did release Elliott's rights under the Policies.  Second, Liberty points out that the consideration for the Settlement Agreement has been allocated such that the amounts paid exceed the policy limits for most of the UTC Policies.  Third, even if the Court were to find that the amounts paid did not exceed the policy limits, Liberty argues that UTC had the right to exhaust the policy limits by agreement as part of a good faith settlement with Liberty.

24

Liberty's first contention is without merit.  Even if UTC had authority to release Liberty from any claims by Elliott, there is no evidence that it did so.  At the time that the Settlement Agreement was signed, Elliott (Elliott Turbo) was a former subsidiary of UTC.  However, the Settlement Agreement only applied to the "UTC Companies," which included included UTC, Carrier, Mostek, Hamilton Standard Controls, Inc., Homogenous Metals, Inc., Otis Elevator Company, United Technologies Automotive, Inc., and "their respective successors, subsidiaries, affiliates and divisions . . . ."  This language is unambiguous, and does not include former subsidiaries such as Elliott, Elliott Turbo, or the Elliott Division.  Indeed, when the parties to the Settlement Agreement wished to reference former subsidiaries, they knew how to do so:

> <u>Defense and Indemnification Regarding Actions Filed by Former UTC Subsidiaries</u>. [T]he UTC Companies shall defend and indemnify Liberty with respect to any Action against Liberty by former subsidiaries of the UTC Companies alleging that Liberty should provide coverage that, absent this Agreement, may be owed to them solely under one or more of the Subject Insurance Policies for Environmental Claims.

The next issue is whether the policy limits were exhausted by the Settlement Agreement. It is clear that an insurer can settle or pay claims in good faith to one insured, even if this results in actual exhaustion of the policy limits to the detriment of another insured.[22]  *E.g., Travelers Indem. Co. v. Citgo Petroleum Corp.*, 166 F.3d 761, 768 (5th Cir. 1999); *Anglo-American Ins. Co. v. Molin*, 670 A.2d 194, 199 (Pa. Commw. Ct. 1995); *Millers Mut. Ins. Ass'n of of Illinois v. Shell Oil Co.*, 959 S.W.2d 864, 871-72 (Mo. App. 1997).  An exception to this rule, not

---

[22]  *Smoral v. Hanover Ins. Co.*, 37 A.D.2d 23 (N.Y. App. Div. 1971), is not to the contrary.  The defendant insurance company in *Smoral* had undertaken the defense of two insureds in a single action.  It then settled the claims as to one of the defendants for the policy limit without providing any notice to the other defendant.  The court therefore found that the insurer had breached its duty of good faith to the non-settling defendant.  *Id*. at 24-25.

25

applicable here, is when a first insured has already agreed to a settlement of claims with the insurer prior to the insurer exhausting the policy limits by paying a later claim of a second insured.  *Western Alliance Ins. Co. v. Northern Ins. Co.*, 176 F.3d 825, 829 (5th Cir. 1999).

At the time of the Settlement Agreement, UTC informed Liberty that it had incurred more than $150 million in losses in connection with sites that were the subject of environmental remediation.  These potential claims were many times greater than the settlement amount of $24.9 million in payments plus $11 million in forgiven premiums.  The total of the available limits for the UTC Policies (with the exception of the 1985-86 products liability aggregate limit) which were exhausted by the Settlement Agreement was less than $21 million.  Thus, Liberty clearly paid amounts that exceeded the policy limits, and the Court finds that all but the 1985-86 products liability aggregate limit were exhausted by the settlement agreement.

Although Elliott does not dispute that these payments were made,[23] it argues that the polices were not exhausted because "[t]he 1994 Settlement Agreement explicitly states that part of the settlement amount is being paid in anticipation of future liabilities not yet incurred by UTC."  However, the settlement provisions referenced by Elliott are merely standard release terms.  That an insurer providing $35.9 million in consideration for settlement also seeks assurance that the other settling parties will not turn around and file more lawsuits does not alter the fact that the Settlement Agreement properly assigned portions of the settlement to particular

---

[23]    Elliott states in its brief that "Liberty Mutual has failed to demonstrate that UTC actually incurred covered losses, and that those losses, when allocated appropriately, resulted in the proper exhaustion of the UTC Policies."  Elliott did not present any authority or argument that Liberty must correlate the settlement to specific losses during the relevant policy periods, and for the reasons stated by Liberty in its Reply, the Court agrees that such an obligation would be improper.

policy periods.

In sum, Liberty has paid amounts greater than the policy limits for the UTC Policies with the exception of the 1985-86 products liability aggregate limit.  The Court concludes that those policies are exhausted.

Assuming for the sake of argument that the policies limits were not actually exhausted by payment of premiums, the Court also finds that they were exhausted by agreement.  The cases that address exhaustion by agreement most often arise with an insured and its excess insurer. The insured settles with its primary insurer for an amount less than the policy limit and stipulates that the policy is exhausted.  It then seeks coverage from its excess insurer for any damages greater than the primary policy limit.  The excess insurer argues that its policies are not triggered, since the primary policy is not actually exhausted by the payment of claims.  Courts have disagreed.  First, to hold otherwise discourages reasonable settlement between the insured and the primary insurer.  Second, the excess insurers are not harmed, since they only pay for losses exceeding the full limit of the primary policy.  *E.g., Fulmer v. Insura Prop. & Cas. Co.*, 760 N.E.2d 392 (Ohio 2002)*; Zeig v. Massachusetts Bonding & Ins. Co*., 23 F.2d 665 (2d Cir. 1928); *Koppers Co., Inc. v. Aetna Cas. & Sur. Co.*,  98 F.3d 1440 (3rd Cir. 1996).

Admittedly, this reasoning does not fit perfectly to the situation of multiple insureds under a single policy.  Unlike an excess insurer, another insured is more likely to be prejudiced by exhaustion of the policy limits.  Nonetheless, an insured should be allowed to exhaust a policy by good faith agreement, even if payments do not actually exceed the policy limits.  A contrary holding would discourage the reasonable settlement of disputes.  *Tenneco Auto. Inc. v. El Paso Corp.*, 2001 Del. Ch. LEXIS 147, *34-35 (Nov. 29, 2001).  As occurred in this case, the

amount at issue prior to settlement will often be well above the policy limits.  In the event that

such a settlement is made in bad faith, the second insured might bring an action on that basis.

*E.g.,  Smoral v. Hanover Ins. Co.*, 37 A.D.2d 23 (N.Y. App. Div. 1971).

**CONCLUSION**

For the foregoing reasons, the parties' cross-motions are GRANTED IN PART AND

DENIED IN PART.  Elliott may not seek coverage under the Carrier Policies or the exhausted

UTC Polices.  Finally, Elliott's request for oral argument is denied.


IT IS SO ORDERED.



 /s/ Patricia A. Gaughan
PATRICIA A. GAUGHAN
United States District Judge


Dated:  5/10/06

28