# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| Elliott Company | ) | CASE NO. 1:05 CV 1387 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| Vs. | ) | |
| | ) | |
| Liberty Mutual Insurance | ) | JUDGE PATRICIA A. GAUGHAN |
| Company | ) | |
| | ) | |
| Defendant/Third | ) | |
| Party Plaintiff, | ) | |
| | ) | |
| Vs. | ) | |
| | ) | |
| United Technologies Corporation, *et al.* | ) | |
| | ) | Memorandum Opinion and Order |
| Third Party Defendants. | ) | |

## INTRODUCTION

Plaintiff Elliott Company ("Elliott") filed this lawsuit seeking insurance coverage for asbestos-related claims from Defendant Liberty Mutual Insurance Company ("Liberty Mutual"). Liberty Mutual then filed a third-party claim against Third-Party Defendants United Technologies Corporation, Carrier Corporation, CTU of Delaware, Inc., Hamilton Sunstrand Corporation, Homogeneous Metals, Inc., Otis Elevator Company and Lear Corporation

1

(collectively "UTC") seeking indemnification for Elliott's claims.  Liberty Mutual (Doc. 70) and

UTC (Doc. 72) have filed cross-motions for summary judgment on the indemnification issue.

For the following reasons, Liberty Mutual's motion is DENIED and UTC's motion is

GRANTED.

**BACKGROUND**

The Court previously summarized the background of this dispute in the Memorandum of

Opinion and Order (Doc. 49) issued on May 10, 2006.  Elliott was an independent company until

1957, at which point it merged with the Carrier Corporation ("Carrier").  Carrier was purchased

by UTC in 1979.  Elliott was spun off from Carrier and  incorporated as a subsidiary of UTC in

1981.  UTC eventually sold Elliott to a group of outside investors in 1987.  Elliott is now faced

with a number of asbestos-related lawsuits.  It seeks coverage under policies issued by Liberty

Mutual to Carrier and UTC that cover 1957 through 1963 (the "Carrier Policies") and 1980

through 1986 (the "UTC Policies").

The Court addressed a number of issues regarding coverage in two previous orders (Doc.

49, 65).  The first issue was whether Elliott was entitled to any coverage under the Carrier and

UTC policies.  The Court concluded that coverage did not transfer to Elliott by operation of law,

but did find that UTC actually transferred coverage under the UTC Policies to Elliott.  After

reconsideration, the Court also found genuine issues of material fact as to whether Carrier

transferred coverage under the Carrier Policies to Elliott.  The second issue was whether a 1994

Settlement Agreement between UTC and Liberty Mutual had successfully exhausted a

significant portion of the available coverage under the UTC Policies.  The Court agreed with

Liberty that coverage was exhausted.

The instant motions require further interpretation of the Settlement Agreement.  The Agreement was entered into by Liberty and the "UTC Companies" (defined in the Agreement as the "Parties") to resolve a significant dispute over coverage for "Environmental Claims" under the "Subject Insurance Policies."  The term "UTC Companies" is defined as a number of companies that roughly align with the third-party defendants in the present action.[1]  Former subsidiaries such as Elliott are not included within the definition of UTC Companies and are not part of the Agreement.  However, the Agreement includes two paragraphs (Paragraphs 12 and 13) in which UTC agreed to indemnify and defend Liberty with respect to actions by former subsidiaries.  A portion of ¶ 12 is at issue here and reads as follows:

> [T]he UTC Companies shall defend and indemnify Liberty with respect to any action against Liberty by former subsidiaries of the UTC Companies alleging that Liberty should provide coverage that, absent this Agreement, may be owed to them solely under one or more of the Subject Insurance Policies for Environmental Claims.

(¶ 12).  The focus of the parties' cross-motions is whether Paragraph 12 requires UTC to indemnify Liberty under the Carrier Policies.

**STANDARD OF REVIEW**

In accordance with Federal Rule of Civil Procedure 56, summary judgment is appropriate when no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *LaPointe v. UAW Local 600*, 8 F.3d 376, 378 (6th Cir. 1993).  The burden of showing the absence of any such genuine issues of material facts rests with the moving party:

---

[1]    The Court may generally refer to the UTC Companies as UTC, recognizing that any difference in the entities comprising the two terms is not particularly relevant to this motion.

3

> [A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrates the absence of a genuine issue of material fact.

*Celotex*, 477 U.S. at 323.  A fact is material only if its resolution might affect the outcome of the lawsuit under the governing law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Once the moving party has satisfied its burden of proof, the burden then shifts to the nonmoving party pursuant to Federal Rule of Civil Procedure 56(e), which provides:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.  If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

In ruling upon the motion, the court must afford all reasonable inferences and construe the evidence in the light most favorable to the nonmoving party. *Cox v. Kentucky Dept. of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995); *United States v. Hodges X-Ray, Inc.*, 759 F.2d 557, 562 (6th Cir. 1985).  However, "[t]he nonmoving party must come forward with some significant probative evidence to support its claim.  If the nonmoving party fails to make a sufficient showing on an essential element, which it has the burden of proof, the moving party is entitled to summary judgment." *Brumbalough v. Camelot Care Centers, Inc.*, 427 F.3d 996, 1001 (6th Cir. 2005) (citing *Celotex*, 477 U.S. at 323-24).

## DISCUSSION

The parties agree that Massachusetts law applies by virtue of the Agreement's choice of

4

law clause.  They also agree on the vast majority of Massachusetts' rules for contract

construction.  The Court decides whether a contract term is ambiguous.  *Alison H. v. Byard*, 163

F.3d 2, 6 (1st Cir. 1998) (applying Massachusetts law).  A contract is not ambiguous simply

because the parties disagree about its interpretation.  *Id*.  Rather, a term is ambiguous only when

the language is reasonably prone to different interpretations.  *Id.*

Massachusetts courts rely heavily on context, which should be used as a tool to find

unambiguous meaning.  *McAdams v. Mass. Mut. Life Ins.*, 391 F.3d 287, 299 (1st Cir. 2004).

"Even if a contract might arguably appear ambiguous from its words alone, the decision remains

with the judge if the alternative reading is inherently unreasonable when placed in context."

*Teragram Corp. v. Marketwatch.com, Inc.*, 444 F.3d 1, 9 (1st Cir. 2006).  Common sense is

among the most important guides to contract interpretation.  *Mass. Ins. Insolvency Fund v.*

*Premier Ins. Co.*, 787 N.E.2d 550, 554 (Mass. 2003); *New England Found. Co. v.*

*Commonwealth*, 100 N.E.2d 6, 11 (Mass. 1951).  Contracts must be read as a whole and terms

should not be isolated or interpreted in a vacuum.  *McAdams*, 391 F.3d at 298.  Contracts should

also be read in a manner such that every word or phrase of a contract is given meaning.  *Premier*

*Ins.*, 787 N.E.2d at 554; *Nat'l Shawmut Bank v. Joy*, 53 N.E.2d 113, 119 (Mass. 1944).

The Court finds it advisable to address the Agreement as a whole before it construes

Paragraph 12.  Most of the terms are not in dispute and are helpful in resolving the disputed

terms.  As the Court noted earlier, the Agreement centers on "Environmental Claims" under

"Subject Insurance Policies."  "Environmental Claims" have a lengthy definition that includes

losses from claims or actions seeking damages as a result of "exposure to asbestos . . . ."  (¶ 2).

Another provision defines "Pollution Claims" as a subset of Environmental Claims.  (*See* ¶ 13).

The "Subject Insurance Policies" are listed in Exhibit A to the Agreement and include 61

insurance policies.  (Ex. A).  Among these 61 policies are the Carrier Policies and UTC Policies.

The Agreement provides as follows regarding the purpose of the Agreement with respect to

Environmental Claims under the Subject Insurance Policies:

> The Parties intend and affirm that this Agreement shall operate as a complete and
> absolute termination of any and all of the Parties' rights and obligations of any
> nature whatsoever, whether known or unknown, arising from or related in any
> manner to the Subject Insurance Policies with respect to Environmental Claims
> except as otherwise expressly set forth in this Agreement, and that all the terms
> and conditions of this Agreement shall be construed by the Parties in a manner
> consistent therewith.

(¶ 17).  However, "this Agreement does not reflect upon the Parties views as to the rights and

obligations with respect to matters or persons outside of the scope of this Agreement."  (*Id.*).

The Agreement provides total compensation to UTC of $35.9 million. This total consists

of $24.9 million in direct payments to UTC and $11.0 million in forgiven retrospective premium

charges that were allegedly owed to Liberty by UTC.  (¶ 1).  The Parties agreed to three separate

release provisions: 1) a "Release of Liberty With Respect to Environmental Claims;" 2)  a

"Release of UTC With Respect to Environmental Claims;" and 3) "Release and Exhaustion

Regarding 1985-86 Non-Product Aggregate Claims."  The Environmental Claims releases are

broad mutual releases as to all coverage and payment obligations for Environmental Claims

under the Subject Insurance Policies.  (¶¶ 3-5).  Other than the amounts discussed above, "the

UTC Companies and Liberty acknowledge and agree that they do not, and shall not in the future,

owe each other any further amounts otherwise owed or owing under the provisions of any of the

Subject Insurance Policies on account of any Environmental Claims."  (¶ 7).  Liberty also agreed

to forego any rights it might have against other insurers related to the Environmental Claims as

well as subrogation rights to claims by the UTC Companies.  (¶¶ 9, 10).

The 1985-86 Release related to Subject Insurance Policy number RG1-612-004136-24, which is also one of the UTC Policies.  (¶ 5).  With respect to that policy the UTC Companies agreed to release Liberty from any coverage obligations under the $10 million aggregate "Non-Products Limits."  They further agreed that the Non-Products Limits of the 1985-86 Policy were fully satisfied and exhausted.  However, the 1985-86 Release did not impact the $20 million limit for coverage related to the "named insured's product."[2]

In addition to the release, the Agreement also addresses coverage limits under the Subject Insurance Policies.  The parties agreed to apply the total compensation amount of $35.9 million such that "the various aggregate limits of one or more of the Subject Insurance Policies shall be impaired according to the schedule set forth on Attachment 'B'."  (¶¶ 6, 8).  To the extent that those policy limits are exhausted, this prevents the UTC Companies from seeking coverage for claims other than Environmental Claims.  As the Court noted in a previous memorandum opinion and order regarding coverage, the exhaustion is also effective as to claims by former subsidiaries.  Relevant to this action, Attachment B provides that the UTC Policies are exhausted or partially exhausted.  (*See* Ex. B).  Attachment B also provides for the exhaustion of the 1985-86 Non-Products Limit as stated in the 1985-86 Release.

The Agreement includes three indemnity provisions.  One relates to actions against

---

[2]      Because the 1985-86 Policy is among the Subject Insurance Policies, the Court presumes that claims resolved under the Non-Products Limits were not Environmental Claims.  Otherwise, they would have been included in the general release of Environmental Claims under the Subject Insurance Policies.  Moreover, exhaustion of the Non-Products Limits for the 1985-86 Policy is already addressed in Paragraphs 6 and 8.

7

Liberty by other insurers and two govern actions against Liberty by former UTC subsidiaries. (¶¶ 11-13).  The indemnity language directly at issue in this lawsuit is in Paragraph 12 and reads as follows:

> [T]he UTC Companies shall defend and indemnify Liberty with respect to any Action against Liberty by former subsidiaries of the UTC Companies alleging that Liberty should provide coverage that, absent this Agreement, may be owed to them solely under one or more of the Subject Insurance Policies for Environmental Claims.

(¶ 12).

UTC focuses on the "absent this Agreement" language.  It believes that this limits UTC's indemnity and defense obligations to actions in which the former subsidiary's coverage rights have been negatively impacted by the Agreement.  As a practical matter, this would limit UTC's obligation to actions claiming that the Agreement improperly exhausted the policy limits.  It argues that Liberty's interpretation—that UTC must indemnify as to all actions by former subsidiaries seeking coverage for Environmental Claims under any Subject Insurance Policy—could be accomplished by deleting the "absent this Agreement" language.  UTC concludes that Liberty's proposed meaning runs afoul of the contract principle that all words of the contract must be given meaning.  *See Premier Ins.*, 787 N.E.2d at 554 (explaining that "every word and phrase of an instrument is if possible to be given meaning").

Liberty focuses on the fact that the indemnity provision references "Subject Insurance Policies."  This is a defined term that means the 61 policies in Exhibit A.  It notes that the exhausted policies—those policies that UTC seeks to limit its indemnity obligation to—are listed in Exhibit B.  According to Liberty, if the parties wished to limit the scope of paragraph 12 to the policies in Exhibit B they could have done so by stating "the policies in Exhibit B" or the

8

"exhausted policies" rather than through an opaque term such as "absent this Agreement." Liberty also posits that UTC's construction is inconsistent with the Agreement as whole, particularly with respect to the related indemnity provision in Paragraph 11.

Paragraph 11 merits detailed consideration. That provision requires the UTC Companies to defend and indemnify Liberty for certain actions filed by other insurers. Both parties' arguments with respect to Paragraph 11 assume that the scope of the obligation is the same as Paragraph 12, except that it applies to actions filed by other insurers rather than former subsidiaries. For example, Liberty assumes that if the Court were to adopt UTC's construction of "absent this Agreement," Paragraph 11 would only cover claims filed by other insurers with respect to the exhausted policy limits. Liberty argues that this result would be absurd in light of its agreement to waive all subrogation rights and not to seek reimbursement from UTC's other insurers.

Paragraph 11 contains "absent this Agreement" language that is similar to Paragraph 12. However, when the two provisions are compared side by side it becomes apparent that the "coverage" that would exist "absent this Agreement" is with respect to different entities:

> Paragraph 11: The UTC Companies shall defend and indemnify Liberty with respect to any Action . . . by any other insurers of the UTC Companies . . . against Liberty alleging that Liberty should provide _coverage that_, absent this Agreement, _allegedly may be owed to the UTC Companies_ under the Subject Insurance Policies for Environmental Claims.

> Paragraph 12: [T]he UTC Companies shall defend and indemnify Liberty with respect to any Action against Liberty _by former subsidiaries of the UTC Companies_ alleging that Liberty should provide _coverage that_, absent this Agreement, _may be owed to them_ under one or more of the Subject Insurance Policies for Environmental Claims.

Once this distinction is recognized, it becomes clear that UTC's interpretation of

9

Paragraph 12 is correct.  Paragraphs 11 and 12 recognize that certain other entities might believe that they were prejudiced by the Agreement.  The Agreement requires the UTC Companies to defend and indemnify Liberty to the extent those other entities were prejudiced by the Agreement.  With respect to other insurers, they are prejudiced to the full extent that the UTC Companies' release of Liberty prevents contribution by Liberty—i.e., all coverage that, absent the Agreement, may be owed to the UTC Companies under the Subject Insurance Policies for Environmental Claims.  This reading reconciles Paragraph 11 with Paragraphs 9 and 10.  Liberty could release its subrogation rights and rights against other insurers because Paragraph 11 protects it against claims by other insurers.

With respect to former subsidiaries, the Agreement makes no claim of releasing their rights under the Subject Insurance Policies.  *See* pg. 1 (defining the Parties as Liberty and the then-existing UTC Companies); ¶ 3 (releasing only claims by the UTC Companies);  ¶ 17 ("[T]his Agreement does not reflect upon the Parties' views as to the rights and obligations with respect to matters or persons outside the scope of this Agreement").  However, as the Court noted in an earlier opinion and order in this action, the Agreement's exhaustion of certain policies does preclude recovery by former subsidiaries such as Elliott to the extent those policies are exhausted.  Consistent with this fact, the obligation to indemnify and defend claims for "coverage that, absent this Agreement, may be owed to [former subsidiaries] under one or more of the Subject Insurance Policies for Environmental Claims" protects Liberty against claims by former subsidiaries that the Agreement improperly exhausted policy limits.

The Court does not necessarily opine that this is the full scope of UTC's indemnity obligation under Paragraph 12.  Exhaustion is the only manner of prejudice to former

subsidiaries that the parties have made the Court aware of to this point.  In any event, the Court is confident that the indemnity obligation at issue in this motion—claims by former subsidiaries under nonexhausted policies—is not coverage that was impacted by the Agreement.

This conclusion is confirmed by Paragraph 13, which provides for defense and indemnification for claims by former subsidiaries under the 1985-86 Policy.  Paragraph 13 does not use limiting "absent this Agreement" language.  Instead, it requires the UTC Companies to defend and indemnify "with respect to any Action against Liberty by former subsidiaries alleging that Liberty should provide coverage for Pollution Claims . . . under the 1985-86 Policy."  The 1985-86 Policy is one of the "Subject Insurance Policies" and "Pollution Claims" are defined as a subset of "Environmental Claims."  Paragraph 13 would be completely redundant if Paragraph 12 covered all claims by former subsidiaries for coverage under "Subject Insurance Policies for Environmental Claims" as Liberty contends.  Instead, it appears that Paragraph 13 provides for an additional obligation to indemnify against all "Pollution Claims" under the 1985-86 Policy, whether or not that coverage would be available "absent this Agreement."

Liberty argues that Paragraphs 12 and 13 should be interpreted in the opposite manner.  According to Liberty, "Pollution Claims" can only refer to claims under the exhausted 1985-86 non-products policy.  Liberty argues that Paragraph 13 applies to claims on one exhausted policy (1985-86 non products) while Paragraph 12 applies to claims against non-exhausted policy limits.  With respect to the other exhausted or impaired policies, Liberty argues that there is no point to an indemnity obligation since both Liberty and UTC argued successfully that Elliott could not challenge the exhaustion.

11

These arguments are lacking in a number of respects.  First, it is plausible that coverage for Pollution Claims could be sought under the products limits.  Pollution Claims include claims "arising out of . . . alleged acts or omissions as a . . . producer . . . of alleged hazardous substances."  Second, it makes little sense that the Agreement would use "absent this Agreement" to refer to coverage of former subsidiaries that was not impacted by the agreement while omitting this language to refer to exhausted policies.  Third, the fact that Elliott was able to make reasonable and good faith arguments in this lawsuit that it should receive coverage under the exhausted policies demonstrates that an obligation to defend and indemnify only exhausted claims is not illusory.

In sum, the Court concludes that UTC's interpretation of Paragraph 12 is correct.  The obligation to indemnify and defend actions by former subsidiaries is unambiguous and only reaches coverage that would be available to the former subsidiaries "absent this Agreement."  UTC is entitled to summary judgment that it is not required to indemnify or defend claims as to the Carrier Policies.

Liberty makes a number of arguments that this result is inconsistent with the Agreement as a whole.  The Court will address these arguments in turn.  The Court has already explained that Paragraph 11 is fully consistent with Paragraphs 9 and 10.  The term "absent this Agreement" in Paragraph 11 is with respect to coverage that the _UTC Companies_ would be entitled to "absent this Agreement."  In light of this broad indemnity and defense obligation it makes sense that Liberty would relinquish its rights against other insurers and its subrogation rights.

Liberty places heavy emphasis on the $30 million cap on the UTC Companies'

12

indemnity and defense obligation.  It notes that the remaining coverage on the exhausted or

partially exhausted policies is only $6 million.  It argues that a $30 million cap for only $6

million of exposure is illogical.  This argument misses the mark.  The UTC Companies' potential

exposure under Paragraph 12 is not only the non-exhausted portion of the partially exhausted

policies, but also includes the actual exhausted amount of $35.9 million.  This is in addition to

the UTC Companies' exposure under Paragraphs 11 and 13.

Liberty points the Court to the cost-sharing provisions of Paragraphs 12 and 14.

Paragraph 12 reads in relevant part as follows:

> With respect to an Action that may be filed against Liberty by former subsidiaries
> of the UTC Companies alleging that Liberty should provide coverage for
> Environmental [C]laims that, absent this Agreement, may be owed to them under
> both the Subject Insurance Policies and that may be owed to them under other
> insurance policies issued by Liberty, the UTC Companies shall share
> responsibility for the defense of such claims pursuant to the terms of Section 14
> herein; provided however that the UTC Companies shall indemnify Liberty as to
> any adjudication or reasonable settlement of such Action only with respect to any
> amounts owed to said former UTC subsidiaries which are directly and solely
> attributable to the Subject Insurance Policies.

(¶ 12).

Paragraph 14 provides that "the UTC Companies and Liberty shall allocate such

responsibility equitably according to the Parties' respective exposure from said action."  (¶ 14).

Notable for purposes of this discussion is that both Paragraphs 12 and 14 limit the UTC

Companies' exposure to claims on the exhausted portion of the policies.  Paragraph 12

accomplishes this through the "absent this Agreement" language and Paragraph 14 does so by

limiting the UTC Companies' responsibility to their "exposure from said action."

Liberty also points to Paragraph 17 which states that the Agreement should be construed

consistent with the intention that "this Agreement shall operate as a complete and absolute

termination of the Parties rights and obligation of any nature whatsoever, whether known or unknown, arising from or related in any manner to the Subject Insurance Policies with respect to Environmental Claims."  Liberty argues that this includes its obligations under the Subject Insurance Policies to former subsidiaries.  However, Paragraph 17 only applies to the "Parties," which is clear from the statement that "this Agreement does not reflect upon the Parties' views as to the rights and obligations with respect to matter or persons outside the scope of this Agreement."  In addition, the blanket obligation to indemnify and defend all claims by former subsidiaries asserted by Liberty is also inconsistent with "a complete and absolute termination" of the UTC Companies' rights and obligations under the Subject Insurance Policies.

Because the Court finds the Agreement to be unambiguous, it sees no reason to resort to extrinsic evidence.  *See Nadherny v. Roseland Prop. Co.*, 390 F.3d 44, 48 (1st Cir. 2004) (explaining under Massachusetts law that when a contract is unambiguous "[t]here is usually, then, no need to consult extrinsic evidence").  Nonetheless, the Court will address Liberty's various arguments that rely on extrinsic evidence.  Liberty points to the parties' negotiations, wherein UTC proposed the following language:

> [N]otwithstanding the provisions of Sections 10 and 11 herein, the UTC Companies shall not be obligated to defend and indemnify Liberty with respect to any action by any insurer or any former subsidiary of the UTC Companies alleging that any payment made by Liberty pursuant to this Agreement has been improperly allocated so as to impair the $10 million aggregate limits of coverage under the 1985-86 Policy for liabilities not related to the "named insured's product."

Liberty argues that "[I]f UTC truly believed that the indemnification obligation was limited to the 8 policies exhausted by the settlement payment by virtue of the phrase 'absent this Agreement,' UTC would have had no reason to propose specific language in Section 5 limiting

14

the indemnification obligation under the 1985-86 Policy . . . ."  This argument is simply wrong.

The 1985-86 Policy was one of the 8 exhausted policies.  It is therefore consistent with UTC's

interpretation of "absent this Agreement" for UTC to seek an exception from the obligation to

indemnify under the 1985-86 Policy.

Liberty also focuses on the parties' negotiations of the dollar limit of the indemnity

obligation.  These arguments are based on the incorrect assumption that UTC's interpretation of

Paragraph 12 limits its exposure to approximately $6 million.  In any event, the negotiations

reveal that the original proposed indemnity cap by Liberty was approximately the same as the

UTC Companies' potential exposure under Paragraph 12—the full exhausted amount of

approximately $36 million.

Finally, Liberty relies on affidavit statements from parties involved in the negotiations to

the effect that they would not have accepted such a limited indemnity obligation with respect to

former subsidiaries.  This evidence cannot alter what the Court finds to be an unambiguous

contract term.  Moreover, these are simply statements by Liberty of their unexpressed desires or

intent, which is of little relevance to contract construction.[3]  *Tudor Press, Inc. v. University*

---

[3]        Although the Court finds it unnecessary to consider extrinsic
           evidence, the Parties' course of performance supports UTC's
           reading of Paragraph 12.  Essex, another former subsidiary of
           UTC, filed an action against Liberty for coverage under some of
           the Subject Insurance Policies.  However, it did not make a claim
           to the exhausted limits.  When Liberty sought coverage under
           Paragraph 12 UTC responded that the claims were not covered
           because "Essex is not making a claim for coverage under the
           Liberty Mutual policies that otherwise would have been available
           had the Settlement Agreement not been entered into by UTC and
           Liberty Mutual."  Liberty's counsel responded that the Essex
           complaint was "unclear as to whether Essex is seeking coverage
           under policy years that were either impaired or exhausted by virtue

15

*Distributing Co.,* 198 N.E. 244 (Mass. 1935); *Herson v. New Boston Garden Corp.*, 667 N.E.2d

907, 917 (Mass. App. 1996).

**<u>CONCLUSION</u>**

Accordingly, the Court GRANTS UTC's motion and DENIES Liberty's motion.


IT IS SO ORDERED.


/s/ Patricia A. Gaughan
PATRICIA A. GAUGHAN
United States District Judge

**Dated:  1/30/07**

---

of the December 9, 1994 Settlement Agreement between [Liberty]
and [UTC]."  For that reason, Liberty refused to waive its right to a
defense and indemnity in the Essex suit.

16