**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **Elliott Company,** | ) | **CASE NO. 1:05 CV 1387** |
| | ) | |
| **Plaintiff,** | ) | **JUDGE PATRICIA A. GAUGHAN** |
| | ) | |
| **Vs.** | ) | |
| | ) | |
| **Liberty Mutual Insurance Company,** | ) | **Memorandum of Opinion and Order** |
| | ) | |
| **Defendant.** | ) | |

### INTRODUCTION

This matter is before the Court upon Motion for Summary Judgment of Defendant/Third Party Plaintiff Liberty Mutual Insurance Company (Doc. 111). Also pending is Plaintiff Elliott Company's Cross Motion for Summary Judgment (Doc. 113). This is an insurance coverage dispute. For the reasons that follow, the motions are DENIED.

### FACTS

The facts of this case have been set forth extensively in this Court's prior Opinions. As such, only those necessary for a resolution of the instant motions are set forth herein.

Plaintiff, Elliott Company ("Elliott"), seeks insurance coverage for asbestos related

1

claims from defendant, Liberty Mutual Insurance Company ("Liberty"), pursuant to policies defendant issued to Carrier Corporation ("Carrier") from 1957-1963.

An understanding of the corporate history of Elliott is critical to an outcome of this matter. On July 31, 1957, Elliott Company merged with Carrier. As part of the merger, the Elliott Company was dissolved and operated as a division of Carrier (the "Elliott Division"). Liberty insured Carrier from the time of the merger through January 1, 1963. Carrier was a named insured on the policies during the relevant period (the "Carrier Policies"), as was "The Elliott Company, A Division of Carrier Corporation." The Carrier Policies included broad occurrence-based general liability coverage for bodily and personal injuries related to an insured's products.

In 1979, United Technologies Corporation ("UTC") acquired Carrier. The Elliott Division continued as an unincorporated division of Carrier until August 21, 1981, when it was incorporated as Elliott Turbomachinery, Inc. ("Elliott Turbo"). Carrier, UTC and Elliott Turbo entered into "an Agreement and Plan of Reorganization and Corporate Separation" dated December 21, 1981 (the "Separation Agreement"). The Separation Agreement includes the following provision relevant to the transfer of assets to Elliott Turbo:

> Carrier will . . . assign, transfer and deliver to [Elliott Turbo] all the properties, assets, good will of every kind and description, both real and personal, tangible and intangible of said [Elliott Division], as set forth in Exhibit A hereto.

Despite a diligent search, Elliott has not been able to locate Exhibit A to determine if it includes the Carrier Policies. In fact, it now appears that Exhibit A may never have existed.

Thereafter, in 1987, UTC[1] sold Elliott Turbo to a group of outside investors pursuant to a

---

[1] UTC owned all of the stock of Elliott Turbo.

Stock and Asset Purchase Agreement ("Purchase Agreement").  The Purchase Agreement contained a provision regarding the transfer of insurance rights,

> 2.12. Insurance.  Schedule 2.12(i) sets forth all of the policies of insurance of or under which any Member of the Group[2] is the owner, insured or beneficiary, or covering any of the property of any Member of the Group....

It is undisputed that the Carrier Policies were not included on Schedule 2.12(i).

The parties cross move for summary judgment on the issue of whether Liberty is obligated to provide coverage to Elliott for asbestos-related occurrences during the 1957-1963 time period.

## STANDARD OF REVIEW

In accordance with Federal Rule of Civil Procedure 56, summary judgment is appropriate when no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *LaPointe v. UAW Local 600*, 8 F.3d 376, 378 (6th Cir. 1993).  The burden of showing the absence of any such genuine issues of material facts rests with the moving party:

> [A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrates the absence of a genuine issue of material fact.

*Celotex*, 477 U.S. at 323.  A fact is material only if its resolution might affect the outcome of the lawsuit under the governing law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Once the moving party has satisfied its burden of proof, the burden then shifts to the

---

[2] "Member of the Group" is defined as Elliott Turbo and certain foreign subsidiaries.

3

nonmoving party pursuant to Federal Rule of Civil Procedure 56(e), which provides:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.  If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

In ruling upon the motion, the court must afford all reasonable inferences and construe the evidence in the light most favorable to the nonmoving party.  *Cox v. Kentucky Dept. of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995); *United States v. Hodges X-Ray, Inc.*, 759 F.2d 557, 562 (6th Cir. 1985).  However, "[t]he nonmoving party must come forward with some significant probative evidence to support its claim.  If the nonmoving party fails to make a sufficient showing on an essential element, which it has the burden of proof, the moving party is entitled to summary judgment." *Brumbalough v. Camelot Care Centers, Inc.*, 427 F.3d 996, 1001 (6th Cir. 2005) (citing *Celotex*, 477 U.S. at 323-24).

**DISCUSSION**

Liberty moves for summary judgment on the grounds that, because Exhibit A does not exist, Elliott cannot prove that the right to insurance proceeds transferred from Carrier to Elliott under the Separation Agreement.  According to Liberty, secondary evidence of the contents of Exhibit A is not admissible under Rule 1004 of the Federal Rules of Evidence ("Rule 1004") because Elliott cannot prove that the document ever existed in the first place.  Elliott responds that it is not seeking to introduce evidence of the contents of Exhibit A.  Rather, Elliott claims that because there is no evidence that Exhibit A was ever created, the Separation Agreement is ambiguous.  As such, extrinsic evidence is admissible to prove the parties' intent.

In the event the Court concludes that "secondary" or "extrinsic" evidence is admissible, both parties claim that they are entitled to summary judgment.  Liberty claims that the evidence demonstrates that the parties did not intend to transfer insurance rights under the Carrier Policies. On the other hand, Elliott claims that reasonable minds could only conclude that the parties intended that rights under the Carrier Polices would transfer under the Separation Agreement.

1. Evidentiary issues and contract ambiguity

Liberty argues that evidence of the contents of Exhibit A is not admissible because the prerequisites to admissibility under Rule 1004 cannot be satisfied.  Specifically, Liberty claims that to permit the introduction of evidence under Rule 1004, the Court must first conclude that Exhibit A was actually created and in existence at some point in time.  Elliott admits, however, that it has been unable to locate any evidence that Exhibit A was ever prepared.

In response, Elliott argues that it need not rely on Rule 1004 because it is not seeking to prove the contents of Exhibit A.  Rather, Elliott claims that because Exhibit A does not exist, the Separation Agreement is ambiguous and, therefore, extrinsic evidence is admissible to resolve the ambiguity and ascertain the parties' intent.   Liberty argues that the Separation Agreement is not ambiguous.  Liberty points out that the Separation Agreement contains an integration clause and also claims that the language is clear.

As an initial matter, the Court finds that Elliott may not introduce "secondary" evidence to prove the actual contents of Exhibit A.  As Liberty points out, Elliott admits that it has no evidence indicating that Exhibit A was created or ever existed.   Elliott does not dispute that, to the extent it seeks to prove the contents of Exhibit A, it must prove that the document existed. Accordingly, the Court finds that Elliott may not introduce "secondary evidence" to prove the

5

contents of Exhibit A.

This finding, however, does not foreclose Elliott from introducing extrinsic evidence in the event the Separation Agreement is ambiguous. To that end, Elliott is not seeking to prove the contents of Exhibit A. Rather, Elliott is seeking to resolve an ambiguity on the face of the Separation Agreement. Accordingly, the Court must determine whether the Separation Agreement is ambiguous.

"Under Delaware law, 'the proper construction of any contract...is purely a question of law.'" *Eames v. Nationwide Mut. Ins. Co.*, 412 F.Supp.2d 431, 435 (D. Del. 2006)(*quoting Rhone-Poulenc Basic Chem. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1195 (Del. 1992)). "Contracts must be construed as a whole, to give effect to the intentions of the parties." *Northwestern Nat'l Ins. Co. v. Esmark, Inc.*, 672 A.2d 41, 43 (Del. 1996)(*citing E.I. duPont de Nemours and Co., Inc. v. Shell Oil Co.*, 498 A.2d 1108, 1113 (1985)). Where the terms of a contract are clear and unambiguous, the Court presumes that the parties' intent resides in the words utilized in the agreement. *Northwestern Nat'l*, 672 A.2d at 672. A contract is ambiguous "only when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings." *Id*.

Upon review, the Court finds that the Separation Agreement is ambiguous. On the one hand, the Separation Agreement clearly provides that the parties to the agreement sought to reorganize and separate the Elliott Division from Carrier. The Separation Agreement is signed by all three parties. The paragraph addressing "the transfer of properties and assumption of liabilities" provides as follows,

> Carrier will . . . assign, transfer and deliver to [Elliott Turbo] all the properties, assets, good will of every kind and description, both real and personal, tangible

and intangible of said [Elliott Division], as set forth in Exhibit A hereto. [Elliott Turbo] agrees to pay, perform, or discharge all debts, liabilities, contracts and obligations of said [Elliott Turbo], whether accrued, contingent, or otherwise, as set forth in Exhibit B hereto.

This language makes clear that the parties intended to transfer at least some of the assets and liabilities attributable to Elliott Turbo. Exhibits A and B, however, were not attached to the Separation Agreement. The Court finds that the failure to attach Exhibits A and B renders the Separation Agreement ambiguous because there is no identification of *which* assets and liabilities transferred.[3] *See, e.g.*, *Glacier General Assurance Co. v. Casualty Indemnity Exchange*, 435 F.Supp. 855, 860 (D. Mont. 1977)(failure to attach exhibits to agreement rendered agreement ambiguous); *Matthews v. UniSource Worldwide, Inc.*, 748 A.2d 219, 221 (Pa. Super. Ct. 2000). To accept Liberty's argument that the Separation Agreement is clear and unambiguous, would in essence mean that no separation or transfer ever occurred.[4] The Court

---

[3] Elliott argues that placement of the comma just prior to the phrase "as set forth in Exhibit A" indicates that the parties intended on transferring all assets of Elliott Turbo and that all of those assets were supposed to be included in Exhibit A. The Court rejects Elliott's argument. If the parties specifically intended on transferring all of the assets, there would be no need for Exhibit A. Moreover, as both parties recognized, Elliott Turbo did not technically own specific assets. Accordingly, the language referencing the transfer of "all" of Elliott Turbo's assets is ambiguous in and of itself.

[4] Liberty essentially argues that the Separation Agreement is clear and unambiguous because none of the language contained therein is subject to interpretation. Liberty's argument, however, ignores the fact that Exhibits A and B, which are supposed to identify the assets and liabilities subject to the separation, are not attached. Taken to its logical conclusion, Liberty would have to argue that no assets or liabilities transferred because nothing is identified in Exhibits A and B.

7

finds that this interpretation contradicts the Separation Agreement as a whole and must be rejected.

        2.        Extrinsic evidence

Elliott argues that the extrinsic evidence demonstrates that the parties to the Separation Agreement intended to transfer the right to insurance coverage under the Carrier Policies. Liberty argues that the extrinsic evidence conclusively establishes the opposite, *i.e.*, the parties did not intend to transfer rights to insurance coverage.

In support of its argument, Elliott claims that the documentary evidence created before the Separation Agreement was signed, the language in the Separation Agreement and the parties' conduct after the separation occurred demonstrate that the parties intended to transfer insurance rights under the Carrier Policies. With regard to pre-contract documentary evidence, Elliott points to the following,

- Notes from a planning meeting in which there was a general discussion that "all of the assets of Elliott Company, a division of Carrier will be transferred..." and that "insurance matters" were to be handled through UTC;

- Two pieces of internal legal correspondence indicating that after the separation, "all assets and liabilities" of the Elliott Division of Carrier will be transferred by Carrier."

- Two pieces of internal correspondence generally discussing the transfer of Elliott Company Division assets and liabilities;

- Internal correspondence referring to Exhibits A and B as "lists of Elliott's assets and liabilities."  No limitation is discussed;

- On the same day the Separation Agreement was signed, a board resolution was enacted by Carrier, which provided that the officers of the corporation were "authorized and directed to distribute and transfer all of the business and assets...occupied or utilized by the Elliott Company ...subject to all of Elliott Company's liabilities...."

8

With regard to the language in the Separation Agreement, Elliott points to the language addressed by the Court above.  As to the post separation conduct, Elliott points to the following,

- Upon receiving claims arising before the separation, Elliott forwarded the claims to Carrier and Carrier informed the insurers of the claims;

- Beginning in 1993, Elliott itself routinely sent notices directly to the insurers and carbon copied Carrier for these claims.  Carrier never objected to this practice;

- Acknowledgment by UTC's attorneys that the parties transferred all of the assets and liabilities of the Elliott Division.

Based on the aforementioned, Elliott argues that reasonable minds could only conclude that the right to insurance coverage under the Carrier Policies transferred to Elliott.

Liberty disagrees.  According to Liberty, it is entitled to summary  judgment.

Liberty relies on the following testimonial evidence,

- Testimony from Daniel Herrick, who was the senior counsel for the Elliott Division when the Separation Agreement was negotiated and executed.  Mr. Herrick testified that "it was the stated intention...that certain assets and liabilities would be transferred to [Elliott Turbo], but I had no idea which ones those would be so I can't say all;"

- Although Herrick was designated to handle insurance matters during the separation, he testified that he had no recollection of handling any such matters;

- Carrier's 30(b)(6) witness testified that two of "Elliott's" foreign subsidiaries and a small parcel of real property were not transferred pursuant to the Separation Agreement;

- Carrier's representative also testified that Carrier found no documents referencing the transfer of insurance policies;

- A list prepared in connection with the deposition identifying the transferred assets does not include reference to insurance policies;

- An April 15, 1982 document entitled "Elliott Company Legal Documents," which is a 20 page list of agreements affecting the Elliott Division that were transferred to Elliott Turbo, does not identify the Carrier Policies;

9

- UTC's representative testified that he prepared Schedule 2.12(i), when UTC sold Elliott Turbo. His task was to "prepar[e] a list of insurance policies that were currently in force or might be called upon to insure open claims that [Elliott Turbo's insurance administrator] and others might have advised me could occur." None of the Carrier Policies appear on Schedule 2.12(i).

In addition to the foregoing testimony, Liberty claims that the very documents relied on by Elliott demonstrate that not all assets were transferred under the Separation Agreement. Specifically, Liberty points out the following,

- The "Action Plan" prepared just prior to the separation indicates that one necessary task was to "determine what assets and liabilities will be transferred to [Elliott Turbo] on 1/1/82;"

- An internal memorandum regarding the transfer of real property, which provides, "please furnish a listing of the property which will be affected;"

- The cover memorandum attached to the draft Board resolutions indicates that Exhibits A and B will be completed as of the close of 1981;

- A Carrier paralegal requested a copy of Exhibit A over a year after the separation.

According to Liberty, none of these actions would be necessary if the parties transferred all of the assets. This, together with the fact that Elliott admits that at least two foreign subsidiaries and a parcel of real property did not transfer, demonstrates beyond dispute that Carrier did not transfer all Elliott Turbo assets to the new entity. Liberty argues that Elliott has no other admissible evidence demonstrating that insurance rights were actually transferred.

Based on a review of all of the evidence, the Court finds that reasonable minds could differ as to whether the right to insurance coverage transferred as part of the Separation Agreement. The Court agrees with Liberty that Elliott may not argue that all assets transferred. As an initial matter, because the Elliott Division operated as an unincorporated division of Carrier, Elliott Turbo possessed no assets of its own. Thus, it would have been legally

impossible to transfer "all assets of the division," without identifying which *Carrier* assets were in fact part of the Elliott Division. This conclusion is buttressed by the fact that certain assets were admittedly not transferred. For example, two foreign subsidiaries were apparently not considered to be "Elliott Division" assets.[5] Alternatively, perhaps these assets were in fact considered Elliott Division assets, but were excluded from the transfer. Regardless, since Elliott Division possessed no assets of its own, some identification of which assets transferred is required.[6] Elliott has no contemporaneous evidence specific to whether the right to bring claims under the Carrier Policies was an "Elliott Division asset" that in fact transferred. The sole document relied on by Elliott provides that "insurance matters" would be handled by Herrick. This evidence, however, does not support a conclusion that the Carrier Policies were transferred. It simply indicates that insurance matters may have been "handled." Moreover, Herrick testified that he does not recall handling any insurance matters. Elliott simply cannot rely on this evidence to prove that the "handling" of insurance matters meant that the parties agreed to transfer the right to assert claims under the Carrier Policies.

On the other hand, Elliott correctly notes that the parties' conduct after the separation supports a conclusion that the parties intended to transfer coverage. Carrier knew that Elliott was seeking coverage for insurance claims under the Carrier Policies and, in fact, assisted Elliott in notifying the appropriate insurer. These actions occurred over a number of years without

---

[5] It appears that some foreign subsidiaries were in fact transferred.

[6] The Court notes that the question is especially difficult with respect to the Carrier Policies since Elliott admits that the entire policies did not transfer. As Liberty points out, Carrier itself submitted claims for pollution related to Elliott after the Separation Agreement.

objection. These actions are entirely inconsistent with a conclusion that the Carrier Policies did not transfer. Had no transfer occurred, there would be no logical reason for Carrier to allow, let alone assist, Elliott in filing claims under Carrier's own policies. And, as Elliott correctly points out, Delaware courts consider the parties' post-contract performance "strong evidence" of intent. *Artesian Water Co. v. State of Delaware*, 330 A.2d 441 (Del. 1974) (actions of the parties are of "great weight" in determining the meaning and applicability of a contract). The Court finds that, based on this evidence, a reasonable juror could conclude that the parties intended to transfer rights under the Carrier Policies.

Liberty argues that Elliott cannot introduce evidence regarding the post contract performance because the employees engaging in the performance do not have personal knowledge. In addition, Liberty claims that Elliott cannot establish a link between the parties' activities after the signing of the Separation Agreement and the parties' intentions at the time the agreement was signed. Elliott argues that the evidence is admissible. According to Elliott, course of performance evidence need not be established by the particular individuals involved in the contract negotiations. Elliott claims that often the negotiators involved in large corporate transactions are not the individuals responsible for implementing the agreements. Elliott points out that the parties to the Separation Agreement consist of the corporate entities, not any particular individual. Because the relevant inquiry focuses on what the "parties" intended, one must look to the actions taken by the corporation–not the particular negotiators– to ascertain the meaning of any ambiguous term.

Upon review, the Court finds that Elliott's evidence of course of performance is admissible. The Court rejects Liberty's argument that the witnesses lack personal knowledge of

the matters to which they will testify. No one disputes that the witnesses themselves were the individuals involved in receiving the claims and forwarding them to the insurers. Rather, the Court finds that the more appropriate inquiry is whether the testimony is relevant to show the intent of the parties at the time the Separation Agreement was signed. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence...more or less probable than it would be without the evidence." Fed. R. Evid. 401. The Court finds that the course of performance evidence offered by Elliott is relevant to show how the parties interpret the Separation Agreement. Delaware courts have considered performance evidence occurring many years after the negotiation of the contract to determine enforceability. *Artesian Water Co. v. State of Delaware*, 330 A.2d 441 (Del. 1974). In this case, the course of performance continued over a number of years and was not limited to an isolated incident.[7] Nor does it appear that the parties ever deviated from their manner of performance. In addition, as a matter of logic, if Carrier's employees believed that Carrier retained the sole right to seek insurance coverage under the applicable policies, these employees would never have assisted Elliott in pursuing the claims. Overall, the Court finds that the course of performance evidence is admissible to show the manner in which the parties interpreted the Separation Agreement.[8]

Although the Court finds that the course of performance evidence is admissible, it is not

---

[7] It appears that Elliott forwarded requests for insurance coverage to Carrier from 1986 through at least 1992, at which point Elliott forwarded the requests for coverage directly to the insurers with Carrier's knowledge and without objection.

[8] The Court rejects Liberty's claim that the evidence is not relevant because interpretation of a contract does not involve factual evidence. The interpretation of ambiguous contracts nearly always requires a factual, as opposed to legal, analysis.

13

sufficient to establish, as a matter of law, that rights under the Carrier Policies transferred. Liberty presented sufficient evidence to create an issue of fact. Specifically, the Court finds that Schedule 2.12, which purports to identify "all" Elliott policies does not include the Carrier Policies. In addition, Liberty relies on a list of assets recently prepared and a detailed list of "Elliott Company Legal Documents" prepared shortly after the separation, which do not include the Carrier Policies. Liberty also points out that Carrier submitted claims for Elliott's pollution on its own behalf after the Separation Agreement. Although Elliott tries to explain away each piece of evidence, the Court finds that Elliott's arguments are better left to the jury. Liberty has presented more than sufficient evidence to survive summary judgment. The evidence, however, is not sufficient, as a matter of law, to rebut Elliott's course of performance evidence.[9]

### **CONCLUSION**

For the foregoing reasons, the Court DENIES the Motion for Summary Judgment of Defendant/Third Party Plaintiff Liberty Mutual Insurance Company and Plaintiff Elliott Company's Cross Motion for Summary Judgment.

IT IS SO ORDERED.

Dated: 11/2/07

/s/ Patricia A. Gaughan
PATRICIA A. GAUGHAN
United States District Judge

---

[9] The Court rejects Liberty's argument that Elliott should be required to prove by clear and convincing evidence that rights under the Carrier Policies transferred. This is not a lost instrument case. Elliott need only prove by a preponderance of the evidence that the ambiguity in the Separation Agreement should be resolved in its favor.